UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

NICOLE PINEDE,

        Plaintiff,

    -against-

NYC DEPARTMENT OF
ENVIRONMENTAL PROTECTION and
THE CITY OF NEW YORK,

        Defendants.

-------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
12-CV-6344 (CBA) (LB)

AMON, Chief United States District Judge:

Plaintiff Nicole Pinede brings this action against the New York City Department of

Environmental Protection ("DEP") and the City of New York ("City") pursuant to Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 2000-e et seq.,[1] and Section 1983[2] of Title 42 based on

purported violations of the Fourteenth Amendment's Equal Protection Clause.[3] Pinede, a Haitian

woman, generally alleges that during her employment as a DEP chemist she experienced

disparate treatment and a hostile work environment as a result of her national origin. She further

claims that she faced retaliation when she complained about her supervisor's conduct.

Defendants have moved for summary judgment on all claims. For the reasons stated below,

defendants' motion is granted.

---

[1] Title VII prohibits an employer from discriminating against any individual with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1).

[2] Section 1983 provides an express cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

[3] The Fourteenth Amendment's Equal Protection Clause provides that: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV

Pinede was born in Port-au-Prince, Haiti. (Defs. Local Civ. R. 56.1 Statement of Undisputed Material Facts ("Defs. 56.1") ¶ 2.) She immigrated to the United States in 1984 and became a naturalized citizen in 2000. (Pinede Dep. at 10:10-17.)

## A.     Initial Employment at DEP

In June of 2004, Pinede was hired by DEP to work as a Lab Microbiologist in the Wards Island Laboratory. (Defs. 56.1 ¶ 3; Pl. Local Civ. R. 56.1 Statement of Undisputed Material Facts ("Pl. 56.1") ¶ 2.) The job duties of a Lab Microbiologist included preparing chemicals, taking the pH of wastewater samples and receiving samples for testing. (Pinede Dep. at 21:14-19.) During her time as a Lab Microbiologist, Pinede also performed tasks normally entrusted to an Assistant Chemist and, as a result, subsequently filed a grievance seeking a promotion to that position. (Id. at 23:20-25.)

In February 2008, DEP responded to Pinede's grievance and promoted her to a provisional (non-Civil Service) position as Assistant Chemist based on her proficiency in a number of the required tasks. (Id. at 23:20-24:10; Defs. 56.1 ¶ 4; Pl. 56.1 ¶ 3; Pl. Ex. P.) As an Assistant Chemist, Pinede was tasked with conducting various wastewater tests—including:

---

[4] The facts recounted below derive from the parties' submissions pursuant to Local Rule 56.1 as well as the Court's independent review of the record. As defendants correctly note, Pinede improperly failed to respond to their Rule 56.1 statement as required by Local Civil Rule 56.1(b). Accordingly, unless unsupported by the record or squarely contradicted by Pinede's own statement of facts, the Court considers the facts presented by defendants as admitted. Local Civ. R. 56.1(c); see Holtz v. Rockefeller & Co., 258 F.3d 62, 74 (2d Cir. 2001) (district courts may not consider as true factual assertions in an undisputed Local Rule 56.1 statement that are unsupported by the record). The Court further notes that many of the assertions Pinede makes in her own Local Rule 56.1 statement either lack citations to the record, are unsupported by the materials cited or cite exhibits that simply were not provided either to the Court or to defendants. (See, e.g. Opp. at 10 (citing non-existent affidavit of Manoj Bhatt); Pl. 56.1 ¶ 9 (citing non-existent exhibits FF and GG).) Accordingly the Court disregards those assertions. See Holtz, 258 F.3d at 73-74 (explaining that "district courts in the Southern and Eastern Districts of New York have interpreted current Local Rule 56.1 to provide that where there are no[] citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion") (alteration in original) (citations and internal quotation marks omitted). Moreover, since at summary judgment the non-movant may not merely "rest on allegations in the pleadings," Salahuddin v. Goord, 467 F.3d 263, 273 (2d Cir. 2006), the Court gives no weight to Pinede's numerous citations to the Complaint. (See, e.g., Wooten Decl. ¶¶ 2, 10, 13-14; Opp. at 5, 9-10.)

suspended solids tests, total kjeldahl nitrogen tests, conductivity tests and pH tests—and then preparing reports that were used by sewage engineers to adjust wastewater treatment methods. (Pinede Dep. at 31:10-35:10, 37:10-38:12.)

**B.    Newton Creek Laboratory**

Following her promotion, Pinede requested and received a transfer to the Owl's Head Wastewater Facility.  (Defs. 56.1 ¶ 5.)  When Owl's Head was closed in 2009, its staff, including Pinede, were reassigned to the Newton Creek Laboratory.  (Id. ¶ 6.)

At Newton Creek, the reports generated by the chemists were approved by their supervisors before being passed along to the quality control department ("QC").  (Pinede Dep. at 42:10-19.)  The chemists' supervisors reviewed the reports to determine if the results were satisfactory, whereas QC primarily focused on data integrity and ensuring that the reports met the requirements set by the federal Environmental Protection Agency.  (Id. at 63:18-64:24; Homer-Gray Dep. at 12:4-17.)  If a chemist's report was found to be unsatisfactory for some reason, either the relevant supervisor or the QC reviewer would inform the chemist that the sample needed to be repeated.  (Pinede Dep. at 42:20-43:16.)

Adeba Negatu ("Negatu"), an Ethiopian woman, became the acting head of Newton Creek Laboratory in 2010 when her predecessor retired.[5]  (Id. at 27:9-29:2, 30:14-31:2.)  In that position she supervised all chemists working in the laboratory.  Negatu reported to the Division Chief of Laboratory Services, which, during the bulk of the relevant period, was Peter Williamsen.  (Id. at 29:3-8, 38:13-24.)  Williamsen is a white American.  (Id. at 43:23-25.)

Sukhadev Aggarwal ("Aggarwal"), an Indian man, acted as the sole assistant laboratory director until May 2012 when Marina Kelman ("Kelman"), a Russian woman, was promoted to

_____

[5] Although Pinede testified that Negatu is Ethiopian, her opposition papers curiously claim that she is Egyptian. (Pl. 56.1 ¶ 30.) However, the Court need not address that contradiction since it does not affect Pinede's claim of discrimination based on her own Haitian origin.

3

assistant director. (Aggarwal Dep. at 7:14-8:18; Pinede Dep. at 47:22-23, 57:25-58:1.) As assistant director, Aggarwal, and later Kelman, reported to Negatu and were charged with directly supervising the chemists' work. (Negatu Dep. at 7:11-8:3.) In his role as Pinede's primary supervisor, Aggarwal frequently reviewed her work, which he characterized as being lower quality than the work produced by other chemists. (Aggarwal Dep. at 6:18-7:10, 9:23-14:8.) Pinede's work was occasionally also reviewed by Negatu prior to being sent to QC for a data integrity check. (Negatu Dep. at 7:11-8:3; Homer-Gray Dep. at 7:8-24, 11:12-12:17.)

During the relevant period, DEP employed a number of other scientists at the Newton Creek site as Associate Chemists, Assistant Chemists and Lab Associates.[6] Negatu and her assistant directors supervised six Associate Chemists at Newton Creek: Manoj Bhatt,[7] George Hennedy,[8] Carlos Quijije,[9] Usha Samuel,[10] Lymanne Sica[11] and Rachel Torchenaud.[12] In addition to Pinede, they also oversaw two other Assistant Chemists at the facility—Myo Aung[13]

---

[6] Employees in each of those titles performed chemical tests in the laboratory, but the positions differed based on the ability of the employees to use laboratory instruments. (Pinede Dep. at 41:18-42:2, 46:1-2, 52:5-53:4.) Whereas Associate Chemists were permitted to use all instruments, Assistant Chemists were limited to certain ones and Lab Associates could not use any instruments. (Id.) DEP eliminated the Assistant Chemist position in 2012, subsequent to Pinede's demotion. (Id. at 51:16-52:4.)

[7] Bhatt, an Indian man, joined Newton Creek as an Associate Chemist in 2009. (Pinede Dep. at 48:17-49:1.) In October of 2012, he transferred to the Staten Island laboratory. (Id. at 7:13-20.)

[8] Hennedy is a second-generation Egyptian immigrant. (Pinede Dep. at 50:17-21.) He was initially employed as an Associate Chemist, but was demoted to Lab Associate in August of 2012 due to his score on the Civil Service Exam. (Id. at 46:19-23, 50:3-7.)

[9] Quijije, an Ecuadorian man, was employed as an Associate Chemist but was demoted to Lab Associate in August of 2012 due to his score on the Civil Service Exam. (Pinede Dep. at 46:10-47:14, 47:24-25.)

[10] Samuel, an Indian woman, has been employed as an Associate Chemist since 2009. (Pinede Dep. at 53:11-21.)

[11] Sica—like Pinede—is a Haitian woman. (Pinede Dep. at 54:1-4.) Sica began working at Newton Creek in 2011 as an Associate Chemist and continues to hold that title. (Id. at 53:22-54:21.)

[12] Torchenaud, an American woman, has held the position of Associate Chemist since at least 2007. (Pinede Dep. at 48:3-16.)

[13] Aung, an Asian man, was employed as an Assistant Chemist throughout Pinede's tenure at DEP. (Pinede Dep. at 29:21-30:7.)

and Daniel O'Connor.[14] Finally, two Lab Assistants—Clara Chen[15] and Michelle Yan[16]— fell within their purview.

In addition to the chemists employed in the Laboratory Department, Newton Creek operated a separate QC Department. During the relevant period in 2011 and 2012, that department consisted of Lalu Monochen, an Indian woman, and Monthee Fay Homer-Gray, a Guyanese woman. (Pinede Dep. at 39:16-40:13, 43:17-20.) Neither woman supervised Pinede, although in their quality control role both reviewed her work to ensure data integrity and federal compliance. (Homer-Gray Dep. at 7:16-8:16; Monochen Dep. at 14:21-15:3.)

### C.  Suspended Solids Test

As an Associate Chemist, Pinede was responsible for, among other things, conducting total suspended solids tests on wastewater samples. The purpose of those tests is to determine the concentration of certain materials in wastewater samples so as to properly calibrate water treatment systems.

To conduct a suspended solids test, chemists separated the solid substances from the wastewater by placing samples into a filtered cup, known as a "crucible." (Pinede Dep. at 65:24-66:8.) Prior to using the crucible, the chemist washed and dried it overnight in a laboratory oven. (Id. at 66:12-21.) The next morning, the chemist removed the crucible and allowed it to cool for half an hour in another instrument known as a desiccator, which prevented it from accumulating moisture. (Id. at 66:22-67:11.) After the crucible cooled, the chemist weighed it and recorded that information in a computer program. (Id. at 67:12-69:10.) The first weight measurement was

---

[14] O'Connor, an American man, was hired in June of 2012 as an Assistant Chemist. (Pinede Dep. at 50:23-52:1.)

[15] Pinede testifies that Chen, a Chinese woman, was employed as a Lab Associate, but contradictorily states she was an Associate Chemist. (Pinede Dep. at 49:4-49:22, 55:24-56:1.) Since Chen's title is irrelevant for the purposes of the current motion, the Court need not further address that discrepancy.

[16] Yan, a Chinese woman, was initially employed as an Assistant Chemist, but was demoted to Lab Associate due to her performance on the Civil Service Exam. (Pinede Dep. at 54:24-55:14, 56:6-7.)

referred to as "Tare 1." (Id. at 67:12-15, 73:11-75:2.) The chemist then repeated the heating, cooling and weighing process for that crucible to obtain a second weight measurement, known as "Tare 2." (Id. at 73:15-74:4.) If the difference between the "Tare 1" and "Tare 2" weights exceeded 0.5 grams, the crucible could not be used for testing. (Id. at 75:3-25.)

Following the tare weighing, the chemist poured a wastewater sample into the crucible and used a vacuum to extract the liquid. (Id. at 70:21-73:10.) The crucible was then heated to remove any remaining moisture from the sample and, after cooling, was again weighed to establish "Dry Weight 1." (Id. at 77:8-78:2.) The chemist then repeated that heating and cooling process before re-weighing the sample to establish "Dry Weight 2." (Id. at 79:17-19, 80:8-14, 80:21-25.) Again, if the difference between the two dry weights exceeded the 0.5 gram threshold, the sample was discarded. (Id. at 79:20-80:7.) Based on the four weights measured by the chemist and the volume of the initial sample, the computer calculated the amount of solid waste present in the sample. (Id. at 80:15-82:11.)

**D.    Allegations of Discrimination**

The Complaint alleges that Negatu, in her position as head of the Laboratory Department at Newton Creek, took a number of purportedly discriminatory acts against Pinede based on her Haitian origin.  Specifically, Pinede bases her claims on two incidents in the end of 2010 and early 2011, as well as a handful of incidents in the spring and early summer of 2012.

1.    Incidents in Late 2010 and Early 2011

In December of 2010, shortly after Negatu became the supervisor of the Laboratory Department at Newton Creek, she instructed Pinede that certain results from a suspended solids test needed to be repeated. (Id. at 84:2-14.) When Pinede disputed that conclusion and argued that repeating the test was unnecessary, Negatu allegedly called her "stupid." (Id. at 84:8-13.) In

6

response, Pinede "told [Negatu] [that if] she call[s] me stupid[,] I will call her stupid back." (Id. at 84:19-21.) Negatu ended the incident by walking away. (Id. at 84:24-25.)

The two women had another verbal altercation in January of 2011 when Pinede again refused to follow Negatu's instructions. That incident began when Pinede informed Negatu that the thermometer in the laboratory oven had expired and Negatu told her to replace it. (Id. at 85:8-86:10.) When Pinede refused, arguing that it was not her responsibility to change the thermometer, Negatu again called her "stupid." (Id. at 85:8-86:10, 86:15-22, 87:23-88:11.)

That time, Negatu reported Pinede's insubordination to her superior, Purnima Dixon, who was then the DEP's Division Chief of Laboratory Services. (Id. at 86:19-87:9.) Dixon held a meeting with both women regarding the incident, but ultimately imposed no discipline on Pinede. (Id. at 89:1-7.) And although Pinede wrote a letter to the Head of DEP Regulatory Administration stating that she believed Negatu's conduct to be harassing, she did not file an EEO complaint based on that dispute. (Id. at 87:10-88:19, 89:8-90:3.)

Pinede concedes that Negatu made no mention of her Haitian origin during either of those initial quarrels. (Id. at 88:18-22.)

2.     Febraury 2012 Incidents and Informal Complaint

After a year of apparent détente between Negatu and Pinede, hostilities erupted again in February 2012. On February 21, 2012, Negatu observed Pinede perform suspended solids tests on several wastewater samples. (Defs. 56.1 ¶ 16.) After reviewing the report Pinede generated, Negatu concluded that the result for one sample was invalid and that the measurement for Dry Weight 1 on another sample had been altered so that it appeared to fall within acceptable limits when, in fact, it did not. (Id. ¶ 17; Defs. Ex. J.)

Later that week, on Thursday, February 23, 2012, Pinede provided her daily test reports to Negatu at approximately 1:30 p.m. (Pinede Dep. at 92:22-93:2.) She did not immediately clear her workstation because lab procedure required her to wait for Negatu's approval before disposing of the day's crucibles. (Id. at 93:7-11.) After an hour of waiting, Pinede decided that such approval would not be forthcoming and told Negatu that her shift was over and that she was going home. (Id. at 93:12-17.) At that point, Negatu instructed Pinede to clean her workstation prior to leaving the laboratory. (Id. at 93:18.) Pinede flatly refused, stating: "I am not going to dump the samples. I gave you the samples an hour ago. I gave you my report an hour ago. You should have [reviewed] it earlier when I ha[d] the time to clean up." (Id. at 93:19-22.) Pinede then left the testing area and went to change before departing for the evening. (Id. at 93:23-94:2.) Negatu chased after Pinede and blocked her from accessing her locker, thereby preventing Pinede from leaving the facility. (Id. at 94:3-95:1.) Negatu did not say anything and after Pinede repeatedly asked her to move, Negatu ultimately relented and allowed Pinede to leave the facility. (Id. at 95:2-11.)

The day after that incident, Friday, February 24, 2012, Negatu instructed Pinede that going forward Pinede (1) must provide a written log detailing her tasks for the day, (2) seek permission before taking a restroom or lunch break and (3) could not speak to other employees in the lab. (Id. at 96:16-97:8.)

The following Monday, February 27, 2012, Pinede sent a brief email to Peter Williamsen—Dixon's successor as Division Chief of Laboratory Services—claiming that she was being "harassed, mistreated, [] verbally abused [and] physically abused by [Negatu]." (Id. at 95:25-96:2, 100:25-101:7, 132:24-134:2.) On February 29, 2012, Williamsen came to Newton Creek and asked to meet with Pinede in Negatu's office. (Id. at 134:3-7.) During that meeting,

Williamsen provided Pinede with an EEO form complaint, but did not discuss the substance of her email. (Id. at 96:3-5, 134:3-135:9.) Negatu was not present at that meeting, but subsequent to it she no longer required Pinede to log her activities, limit her contact with other employees or seek permission before taking a break. (Id. at 143:20-144:1.)

3.    March 1 Staff Meeting

On March 1, 2012, Negatu held a department meeting that was attended by all chemists in the lab, including Pinede. (Id. at 114:12-115:23, Defs. Ex. K.) During that meeting, Negatu reminded the staff of the proper procedure for performing a suspended solids test. (Id. at 116:13-117:5.) In particular, Negatu stressed that if either of the second weight measurements fell outside the 0.5 gram threshold, the chemists should weigh it a third time to see if a proper weight could be established before discarding the sample. (Defs. Ex. K at DEP00401.) Moreover, Negatu noted that although employees generally could take lunch at any convenient time, a set lunch break would be enforced if an employee failed to finish his or her work for the day. (Id. at DEP00400.)

4.    Pinede's EEO Complaint

That same day, March 1, 2012, Pinede mailed the completed EEO form to DEP's main office. (Pinede Dep. at 135:22-136:11.) Her complaint alleged that Negatu discriminated against her on February 24 and 27, 2012 by requiring her to provide a written report of her tasks, forbidding her from speaking to other employees and requiring her to seek permission to take a break. (Id. at 136:23-139:11, 142:16-144:1; Pl. Ex. D at DEP00198.) She also claimed that Negatu threatened to terminate her by noting that there would soon be too many chemists in the lab. (Pinede Dep. at 138:20-139:11; Pl. Ex. D at DEP00198.) In the section of the complaint requesting corrective action, Pinede asked for a more fair distribution of work, a work day that

9

did not exceed seven hours, and the ability to work "without pressure from my supervisor." (Pl. Ex. D at DEP00201.)

Nowhere in the EEO complaint did Pinede mention her national origin and she left blank the section entitled "What is the Alleged Basis of Discrimination (Check All that Apply)." (Pinede Dep. at 139:12-140:22, Pl. Ex. D at DEP00196, 198.)

5.    Probationary Period

Based on her performance on the Civil Service Exam in 2010, DEP placed Pinede on a waitlist for a permanent position as an Assistant Chemist. (Pinede Dep. at 127:18-129:2.) On March 12, 2012, the DEP reached her number on the waitlist and appointed her to that permanent position, subject to a three-month probationary period. (Defs. 56.1 ¶ 7.)

Roughly a month later, fluid accumulated in Pinede's eye and began to obstruct her vision. (Pinede Dep. at 151:21-25.) As a result, Pinede had an unplanned surgery on the afternoon of April 12, 2012 to remove the fluid. (Id. at 151:14-25.) Pinede's doctor performed the procedure in his office and released her the same day. (Id. at 152:1-7.) Pursuant to DEP policy, Pinede called Negatu on the morning of April 13, 2012 to inform her that she would be absent from work while she recovered from the surgery.[17] (Id. at 149:18-151:8.) During that call, Pinede told Negatu that she planned to return to work on April 18, 2012, but might need to take additional sick leave if she had not recovered at that point. (Id. at 150:13-151:8.)

---

[17] Like many employers, the DEP requires its employees to follow certain procedures to claim sick leave. (Defs. Ex. L; see Pinede Dep. at 148:7-150:9.) As explained in the DEP Employee Handbook:

> Employees unable to report to work should inform their supervisor within one hour of their regular starting time or as specified by their bureau's regulations. When an employee fails to call in during the sick day taken, he or she will be considered "AWOL" (Absent Without Official Leave). A supervisor may request documentation at any time, if circumstances warrant. . . . When an employee returns, he/she should promptly fill out a Request for Leave form (A-79D) for his/her supervisor's approval.

(Defs.' Ex. L at DEP00478 (emphasis in original).)

When the swelling from her surgery did not go down as expected, Pinede returned to the doctor on April 17, 2012. (Id. at 152:23-153:15.) At that point, she was placed her under sedation and kept overnight for observation. (Id. at 153:9-15, 155:23-24.) Since the clinic did not permit cell phones, Pinede asked her husband to call Negatu's office on the evening of April 17 to let her know that Pinede would not be returning to work on April 18, as planned. (Id. at 153:17-154:4.) Using Pinede's phone, her husband dialed the number she listed as "DEP" at around 10:30 p.m. on the night of April 17. (Liautaud Dep. at 15:5-17:8.) He claims to have left a voicemail stating that Pinede would be absent from work on April 18, but could not recall the name of the person for whom he left a message. (Id. at 15:17-16:11.) Pinede's April 2012 phone bill shows a two-minute phone call was placed on April 17, 2012 at approximately 10:33 p.m. (Pl. Ex. H at 3.) Negatu testified that she never received that message and has no knowledge of anyone else in the laboratory receiving it. (Negatu Dep. at 52:9-18.) It is undisputed that neither Pinede nor her husband made any calls to request additional sick leave after April 18, 2012. (Pinede Dep. at 157:4-158:25; Defs. 56.1 ¶ 30.)

When Pinede returned to work on April 23, she presented Negatu with a note from her doctor that stated in its entirety: "Mrs. Pinede [was] under medical treatment from 4/12/12 to 4/22/12." (Pl. Ex. O; see Pinede Dep. at 158:4-160:4; Negatu Dep. at 50:22-24.) Negatu asked Pinede to explain why she had failed to call to report her absence on April 18, 19 or 20th as required by DEP policy. (Negatu Dep. at 58:10-59:5; see also Pl. Ex. Q at DEP00023.) In response, Pinede stated "I don't know" and provided no further explanation. (Pl. Ex. Q at DEP00023; Negatu Dep. at 59:6-15.) When Williamsen visited Newton Creek on April 25, he also asked Pinede why she had failed to call and she responded that "she was medically unable to call, that no family members kn[e]w the phone number of the laboratory and that her cell phone

was dead."[18] (Pl. Ex. Q at DEP00023; Negatu Dep. at 58:10-59:15.) Since Negatu found those explanations unsatisfactory, she denied both Pinede's request for sick leave and her application to use vacation time for those days. (Negatu Dep. at 50:7-59:15; Pl. Ex. Q at DEP00023-24.) Instead, Negatu marked Pinede as AWOL for those three days. (Pl. Ex. Q at DEP00024; Defs. Ex. M.)

On May 21, 2012, Pinede performed a number of suspended solid tests on wastewater samples. During those tests, the weight of crucible number 39 failed—i.e. the second weight differed from the initial weight by more than 0.5 grams. (Defs. 56.1 ¶¶ 32-33.) Rather than taking the required third weight measurement or discarding the sample as required by laboratory procedure, Pinede copied the weight for crucible number 89 and used that weight to replace the weight measurement for the failed crucible. (Defs. 56.1 ¶ 35; Defs. Ex. O.) Negatu observed that manipulation on her computer and captured screenshots of the data replacement that Pinede performed. (Defs. 56.1 ¶ 36; Pl. Ex. Q, at DEP00024, 26-27; Defs. Ex. O.)

6.    Termination of Probation

On the morning of June 7, 2012, Negatu and Williamsen met with Pinede to provide an evaluation of the work performed during her probationary period. (Pinede Dep. at 199:3-200:21.) Negatu and Williamsen rated her performance as unsatisfactory because she "doesn't listen to the supervisor, doesn't follow the [Standard Operating Procedure], and call[ed] into question [the] validity of the data used for regulatory reporting and process control," as well as, her three days of AWOL status. (Pl. Ex. Q at DEP00031.) Pinede refused to sign the evaluation. (Id. at 10; Pinede Dep. at 200:1-8.)

---

[18] In discussing her sick leave with Negatu and Williamsen, Pinede made no mention of the voicemail her husband purportedly left on April 18, 2012 regarding her absence for that day. (See, e.g., Pl. Ex. Q.)

Later that day, Williamsen sent a memorandum to Diane Hammerman, Director of DEP's Office of Regulatory Compliance and Administration, detailing Pinede's performance during her probationary period. (Defs. 56.1 ¶ 37; Pl. Ex. Q at DEP00023-24.) Specifically, Williamsen noted that Pinede had been AWOL for three days and was accused of falsifying data related to the May 21, 2012 suspended solids tests, and provided documentation supporting those allegations. (Pl. Ex. Q at DEP00023-31.) Williamsen concluded that "being AWOL while serving in a probationary title is unacceptable" and "[t]ampering with analytical data is a serious matter and should be given great consideration while evaluating Ms. Pinede's probationary status." (Id. at DEP00024; Defs. 56.1 ¶ 38.) Based on those findings, Hammerman, along with the Office of Disciplinary Counsel, found that "demotion was the appropriate action." (Pl. Ex. Q at DEP00022; Defs. 56.1 ¶ 39.)

On June 8, 2012, the DEP Deputy Commissioner informed Pinede that her probation had been terminated and that she would revert to her permanent title of Scientist (Water Ecology) on June 11, 2012. (Defs. 56.1 ¶ 40.)

7.     Disciplinary Charges

On June 22, 2012, the DEP's Office of Disciplinary Counsel initiated formal proceedings against Pinede. (Defs. 56.1 ¶ 41.) The charging document alleged that Pinede committed four violations of the DEP's Uniform Code of Discipline: (1) Rule E.18 (falsification of data); (2) Rule E.12 (neglect of duty); (3) Rule E.3 (violation of internal rule); and (4) Rule E.24 (absent without authorization). (Defs. Ex. R.)

13

Pinede pled guilty to those charges in exchange for a reduced punishment on August 20, 2012. (Defs. 56.1 ¶¶ 42-43.) By entering that agreement, Pinede expressly and irrevocably waived her "right to a Section 75 hearing."[19] (Defs. Ex. S at DEP00008.)

## DISCUSSION

### I. Standard of Review

Summary judgment is appropriate when the pleadings and evidence that would be admissible at trial show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008). The Court's function is not to resolve disputed issues of fact but "to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

The moving party carries the initial burden of demonstrating the absence of a material factual question. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In determining whether it satisfied that standard, the Court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted). Nevertheless, the non-moving party cannot rest merely on speculations, conjecture or denials but "must set forth specific facts showing that there is a genuine issue for trial."[20] See Irizarry v. Catsimatidis, 722 F.3d 99, 103 n.2 (2d Cir. 2013) (quoting Rubens v. Mason, 527 F.3d

---

[19] Inexplicably, Pinede repeatedly references a hearing in her motion papers. (See, e.g., Opp. at 14 ("[N]one of this additional information was considered by Defendants during the Plaintiff's grievance hearing.").) Those references find no support in the record, which is devoid of any indication that a hearing was held. Rather, it strongly implies that Pinede's guilty plea waived her right to such a hearing. (See Defs. Ex. S at DEP00008.) Accordingly, the Court gives no weight to discussions of the claimed hearing or the evidence purportedly presented at it.

[20] Pinede's claim that the Court can "accept the allegations contained in the Plaintiff's Amended Complaint as true and draw all reasonable inferences in [her] favor" misstates the law. See Salahuddin, 467 F.3d at 273 ("[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment.") (citing Celotex, 477 U.S. at 324).

14

252, 254 (2d Cir. 2008)). A genuine issue exists only where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (internal citations omitted).

## II. Claims Against DEP

Defendants persuasively argue that all claims against DEP must be dismissed because it is not a suable entity. As Pinede fails to respond to that argument, her claims against DEP are deemed abandoned and dismissed. See Apple v. Atl. Yards Dev. Co., LLC, No. 11-CV-5550 (JG), 2014 WL 5450030, at *6 (E.D.N.Y. Oct. 27, 2014) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.") (citation omitted). And even if Pinede had not abandoned those claims, they would fail because under New York law claims may not be brought against municipal agencies, but instead must name the City itself. Quadrozzi Concrete Corp. v. City of New York, No. 03-CV-1905 (LAP), 2004 WL 2222164, at *1 (S.D.N.Y. Sept. 30, 2004) (holding that DEP is not a suable entity) aff'd, 149 F. App'x 17 (2d Cir. 2005). Accordingly, all claims against DEP are dismissed.

## III. Title VII Discrimination Claims

The claim of national origin discrimination Pinede asserts under Title VII is assessed using the familiar burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under that framework, the plaintiff must first establish a prima facie case of discrimination by showing that (1) she "is a member of a protected class;" (2) she "was qualified for the position [s]he held;" (3) she "suffered an adverse employment action;" and (4) "the adverse action took place under circumstances giving rise to

15

the inference of discrimination." Ruiz v. Cnty. of Rockland, 609 F.3d 486, 491-92 (2d Cir. 2010) (citations omitted).

If the plaintiff makes that initial showing, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Id. at 492. "[O]nce the [employer] has made a showing of a neutral reason for the complained of action, to defeat summary judgment . . . the [employee's] admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the [employer's] employment decision was more likely than not based in whole or in part on discrimination." Kirkland v. Cablevision Sys., 760 F.3d 223, 225 (2d Cir. 2014) (per curiam) (internal quotation marks and citations omitted) (alteration in original).

### A. **Prima Facie Case of Discrimination**

Although Pinede concedes that Negatu never explicitly referenced her Haitian origin, she contends that an inference of discriminatory intent arises here because she was treated differently than her non-Haitian coworkers. "A plaintiff may support an inference of . . . discrimination by demonstrating that similarly situated employees [not in the protected class] were treated more favorably." Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d Cir. 1999). To allege such a case of disparate treatment, the plaintiff must show that "'her co-employees were subject to the same performance evaluation and discipline standards . . . [and] that . . . the employees who went undisciplined engaged in comparable'—albeit 'not [ ] identical'—'conduct.'" Chan v. Donahoe, 63 F. Supp. 3d 271, 296 (E.D.N.Y. 2014) (quoting Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000)).

In support of her disparate treatment claim, Pinede raises a number of scenarios where non-Haitian employees purportedly received favorable treatment. Defendants respond that

because the employees Pinede compares herself to were not similarly situated, any differences in treatment fail to raise the necessary inference of discriminatory animus.

First, Pinede claims that when her non-Haitian co-workers made laboratory errors, Negatu did not force them to re-test those samples nor did she impose disciplinary action. Since Pinede faced both reprimands from Negatu and formal disciplinary charges, she contends that a reasonable factfinder could conclude that her Haitian origin explains the difference in treatment. That argument ignores the fundamental nature of Pinede's misconduct. Despite her repeated claims to the contrary, the uncontroverted record clearly establishes that her demotion was based on her intentional falsification of data, not simple mistakes. (Pl. Ex. Q; Defs. 56.1 ¶¶ 32-36.)[21] Far from showing that her non-Haitian co-workers also fraudulently manipulated their data, Pinede concedes that they "did not falsify their records." (Pinede Dep. at 195:11-14.) Thus, their conduct offers no valid basis for comparison. See Akinyemi v. Chertoff, No. 07-CV-4048 (AJP), 2008 WL 1849002, at *5 (S.D.N.Y. Apr. 25, 2008) (plaintiff who committed intentional misconduct not similarly situated to employee who made careless errors); Minh Nguyen v. People's United Bank, No. 10-CV-455 (CFD), 2011 WL 2198315, at *3 (D. Conn. June 6, 2011) (Droney, J.) (plaintiff who intentionally falsified data not similarly situated to employee who negligently certified information as correct based on plaintiff's representations).

Second, Pinede claims that Negatu's grant of sick leave to Aung when he had surgery evinces discriminatory intent given Negatu's denial of her similar request for leave. However, Pinede again fails to establish the validity of that comparison because she admits that she does not know whether Aung called Negatu prior to taking leave, as required by DEP policy. (Pinede

---

[21] Pinede's repeated claim that Negatu charged her with insubordination due to mistakes in her calculations is flatly contradicted by the record. Although the Office of Disciplinary Counsel initiated numerous charges against Pinede, it did not allege a violation of Rule E.5 (insubordination). (See Defs. Ex. R; Defs. Reply Ex. A.) Nor did Pinede merely err in her calculations; rather, she admitted to intentionally manipulating and falsifying laboratory data. (See Defs. Ex. S; Pl. Ex. Q; Defs. 56.1 ¶¶ 32-36.)

Dep. at 148:7-150:2, 164:6-9; Defs. Ex. L at 21.) Since Pinede pled guilty to being absent without leave (see Defs. Exs. R-S), an employee who complied with DEP procedures is not similarly situated to her.

Third, Pinede confusingly claims that DEP extended the probationary period of other employees who took vacation but failed to do so with her. That claim misstates the record. DEP did not deny Pinede an extension of her probationary period; it terminated her probation and demoted her for cause.[22] Indeed, that is the very adverse employment action necessary to maintain her claim. Since the pro forma extensions of probation following vacation bear little resemblance to termination of the period due to intentional misconduct, the Court concludes that comparison again misses the mark.

Finally, Pinede claims that since DEP procedure required re-testing to be performed by another chemist, Negatu's insistence that she redo her own mistakes evinces discriminatory intent. "Departures from procedural regularity can create an inference of discriminatory intent," Nurse v. Lutheran Med. Ctr., 854 F. Supp. 2d 300, 317 (E.D.N.Y. 2012) (citation omitted), but the record here shows no such procedural deviation. Simply put, Pinede fails to establish that DEP procedure precluded Negatu from requiring that Pinede repeat her own tests. Although Pinede contends that the Head of the QC Department, Homer-Gray, testified that such a policy existed, her failure to include a citation to the relevant testimony belies that claim. (See Opp. at 5); Holtz, 258 F.3d at 73-74. And the Court's review of Homer-Gray's deposition transcript reveals no such statement. As Pinede fails to shoulder her burden of establishing such a

---

[22] Although the argument is not entirely clear, Pinede appears to rely on a portion of her appointment letter which provides that the "probationary period will be automatically extended by the number of days that I am absent and/or not performing the duties of my position." (Pl. Ex. I.) Based on that statement, she seems to argue that DEP was required to extend her probation despite her flagrant misconduct and that its failure to do so evinces discriminatory intent. That argument is frivolous. To the contrary, an employee's intentional misconduct is the quintessential legitimate, non-discriminatory reason for demotion or termination.

procedure existed, the purported deviations cannot raise the necessary inference of discriminatory intent.

In sum, Pinede fails to identify any similarly situated employee who received more favorable treatment or otherwise suggest any other facts giving rise to the necessary inference of discrimination. Rather, she "merely describes her "alleged mistreatment and ask[s] the court to conclude that it must have been related to [her] [national origin]. This is not sufficient." Grillo v. N.Y.C. Transit Auth., 291 F.3d 231, 235 (2d Cir. 2002) (quoting Lizardo v. Denny's, Inc., 270 F.3d 94, 104 (2d Cir. 2001) (Amon, J.)); see also Rivera v. Metro. Transit Auth., 750 F. Supp. 2d 456, 461–62 (S.D.N.Y. 2010) ("While racism and all its manifestations are deplorable, the inference that it is present whenever something unwelcome happens to a member of an identifiable minority group is not rational."). Because Pinede cannot establish a prima facie case, summary judgment is appropriate on her Title VII claim. See Risco v. McHugh, 868 F. Supp. 2d 75, 106 (S.D.N.Y. 2012) (granting summary judgment where the plaintiff failed to "submit any evidence to show that any of the conduct she complains of was undertaken because of her race or color").

**B.    Legitimate, Non-Discriminatory Reason for Demotion**

Even assuming Pinede could establish a prima facie case—which she cannot—her own misconduct plainly provides a legitimate, non-discriminatory reason for her demotion. See Cai v. Wyeth Pharm., Inc., No. 09-CV-5333 (GBD), 2012 WL 933668, at *9 (S.D.N.Y. Mar. 19, 2012) ("Courts have uniformly held that falsifying company documents is a legitimate, non-discriminatory reason for termination."); Brown v. Pension Bds., 488 F. Supp. 2d 395, 403, 406, 410 (S.D.N.Y. 2007) (two days AWOL provided legitimate, non-discriminatory cause for termination on the basis of job abandonment).

## C.    Pretext

Pinede cannot satisfy her burden to show that those legitimate, non-discriminatory reasons for demotion were mere pretext.  Pinede appears to argue that her years of satisfactory performance as a provisional Assistant Chemist undercut the claim that she committed misconduct and failed to perform during her probationary period.  That argument is meritless.  Indeed, it is well-settled that "[t]he mere fact of past satisfactory performance, followed by negative feedback, is not suggestive of impermissible animus."  Missick v. City of New York, 707 F. Supp. 2d 336, 350-51 (E.D.N.Y. 2010) (collecting cases); accord E.E.O.C. v. Bloomberg L.P., 967 F. Supp. 2d 816, 858–59 (S.D.N.Y. 2013) ("[A] claimant cannot merely point to prior favorable evaluations to satisfy her burden at the pretext stage.") (citing Viola v. Philips Med. Sys. of N. Am., 42 F.3d 712, 717-18 (2d Cir. 1994)).  The logic of those decisions applies with all the more force here given that Pinede admitted to intentionally falsifying data and committing other misconduct.  (See Defs. Exs. R-S.)

The remainder of Pinede's argument essentially amounts to her claim that she was in fact innocent of the disciplinary charges leveled against her.  As Pinede pled guilty to those charges, (Defs. 56.1 ¶¶ 42-43), she cannot re-litigate that issue here.  And those claims would fail in any event because a plaintiff's "factual disagreement with the validity of an employer's non-discriminatory reason for an adverse employment decision does not, by itself, create a triable issue of fact."  Risco, 868 F. Supp. 2d at 104-05 (quoting Fleming v. MaxMara USA, 644 F. Supp. 2d 247, 266 (E.D.N.Y. 2009) aff'd, 371 F. App'x. 115, 117–18 (2d Cir. 2010)).  Even if Negatu "did exaggerate or lie about [Pinede's] conduct or performance, there is no evidence in the record to support a finding that [s]he did so in order to conceal any prohibited motivation based on" her national origin.  Id. at 105 (citing Grillo, 291 F.3d at 235).  Indeed, Pinede largely concedes that Negatu scrutinized her work because she considered her incompetent, rather than

20

due to her national origin. (See Opp. at 8 (attributing Negatu's actions to "her conclusion that the Plaintiff could not perform her tasks").) Drawing all inferences in Pinede's favor, the record merely suggests that Negatu considered Pinede inept, unqualified or lazy, which is insufficient to survive summary judgment on a discrimination claim. See Grillo, 291 F.3d at 235.

Finally, Pinede's pretext claims are further undermined by the uncontested fact that another Haitian—Lymanne Sica—continues to be employed at the Newton Creek lab and is supervised by Negatu. (See Defs. 56.1 ¶ 44); Reyes v. N. Shore-Long Island Jewish Health Sys., No. 00-CV-6400 (FB), 2005 WL 1941634, at *7-8 (E.D.N.Y. Aug. 15, 2005) (granting summary judgment on Filipino plaintiff's national origin claim where another Filipino employee successfully completed the purportedly discriminatory program).

Pinede claims that Sica's continued employment is irrelevant because she was on maternity leave during the period in question. (Pl. 56.1 ¶ 44.) That both misses the point and misstates the record. Sica began working at Newton Creek in 2011. (Pinede Dep. at 54:9-16; Defs. Ex. I (employed as of October 12, 2011).) Although Pinede does not state when her maternity leave began, her attendance at the March 1, 2012 staff meeting strongly suggests it began after March 1, 2012. (See Defs. Ex. K at DEP00398.) And Pinede testified that Sica returned from maternity leave in May or June of 2012. (See Pinede Dep. at 208:18-22.) Therefore, Sica was present for the majority of the purportedly discriminatory actions in 2011 and 2012. Moreover, it is her continued successful employment at DEP—not her presence during each offending action—that undermines the claim that Negatu discriminates against Haitians. See Reyes, 2005 WL 1941634, at *7-8.

Accordingly, Pinede's Title VII claim against the City is dismissed.

## IV. Hostile Work Environment

To establish a hostile work environment claim, Pinede must show "that the complained of conduct (1) is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's protected characteristic." Bowen-Hooks v. City of New York, 13 F. Supp. 3d 179, 234 (E.D.N.Y. 2014) (quoting Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007) (per curiam)). "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. . . . Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks and citations omitted).

Here, Pinede alleges that Negatu (1) called her "stupid" in December 2010 and January 2011; (2) temporarily prevented her from leaving the lab on February 23, 2012 after she refused to clean her work station; (3) required her to log her activities, request permission to take breaks and forbade her from speaking to others for a week; and (4) generally scrutinized her work. That handful of incidents spread over more than two years falls well short of the severe and pervasive conduct needed to establish a hostile work environment. See id. Nor does the record support an inference that any of those sanctions were motivated by her national origin. Accordingly, the Court grants summary judgment as to the hostile work environment claim.

## V. Retaliation Claim

Pinede also asserts claims of retaliation against the City pursuant to Title VII.[23] Claims of retaliation under Title VII are also analyzed under the McDonnell Douglas burden-shifting

---

[23] Defendants correctly note that Section 1983 does not permit a retaliation claim based on the Equal Protection Clause. Awad v. City of New York, No. 13-CV-5753 (BMC), 2014 WL 1814114, at *8 (E.D.N.Y. May 7, 2014)

analysis. Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 843 (2d Cir. 2013) (citations omitted). "Under the first step of th[at] . . . framework, the plaintiff must establish a prima facie case of retaliation by showing 1) participation in a protected activity; 2) the defendant's knowledge of the protected activity; 3) an adverse employment action; and 4) a causal connection between the protected activity and the adverse employment action." Id. at 844. If plaintiff satisfies that initial burden "a presumption of retaliation arises." Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010) (citation omitted). The burden then shifts to the defendant to articulate a legitimate, non-retaliatory reason for the purportedly retaliatory action. Zann Kwan, 737 F.3d at 843. If it does so, the plaintiff must show that "retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." Id. at 845 (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. ---, ---, 133 S. Ct. 2517, 2526, 2533 (2013)).

### A.    **Prima Facie Case of Retaliation**

Pinede alleges that she was retaliated against because her demotion and the imposition of disciplinary charges took place after she complained about the alleged discrimination. Although Pinede's briefs are difficult to decipher, she presents two possible bases for her retaliation claim: her February 27, 2012 email to Williamsen and her March 1, 2012 EEO Complaint. Defendants correctly respond that both discuss only generalized grievances and therefore do not constitute protected conduct.

According to Pinede her February 27, 2012 email was "brief" and merely stated that she had been "harassed, mistreated [], verbally abused [and] physically abused" with no additional

---

(citing Bernheim v. Litt, 79 F.3d 318, 323 (2d Cir. 1996)). Therefore, to the extent Pinede raises any such claim, the Court dismisses it. Moreover, even if such a claim were cognizable under § 1983, it would fail for the same reasons as Pinede's Title VII claim.

information.[24] (Pinede Dep. at 133:2-134:2; see also id. at 95:21-96:5.) Her EEO Complaint likewise claimed discrimination based on Negatu's requirement that Pinede log her work activities, request permission to take breaks and not talk with others in the lab. (Pl. Ex. D at DEP00198.) Notably, Pinede left blank the space on the EEO form that asks: "What Is the Alleged Basis of Discrimination? (Check All that Apply)." (Id. at DEP00196.) Indeed, no mention of her Haitian origin appears anywhere in the EEO Complaint. (Id.)

A complaint provides a basis for a retaliation claim only if "the employer . . . understood, or could reasonably have understood, that the plaintiff's [complaint] was directed at conduct prohibited by Title VII." Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 108 (2d Cir. 2011) (alteration in original) (internal quotation marks and citations omitted). Neither the February 27 email nor the EEO Complaint can be fairly read to raise a protected claim of discrimination, rather they simply raise generalized grievances about management that fall outside the scope of Title VII. See Benedith v. Malverne Union Free Sch. Dist., No. 11-CV-5964 (ADS) (GRB), 2014 WL 4056554, at *30 (E.D.N.Y. Aug. 15, 2014) (finding "generalized complaints about a supervisor's treatment are insufficient to state protected activity" or to make employer aware that plaintiff was engaging in protected activity); see also Fattoruso v. Hilton Grand Vacations Co., LLC, 525 F. App'x 26, 28 (2d Cir. 2013) ("Nor does [plaintiff's] belief that he was being treated 'unfairly' transform his complaints . . . into charges over unlawful discrimination."). Thus, Pinede's retaliation claim fails.[25]

---

[24] Since Pinede did not include a copy of that email in support of its motion, the Court cannot fully deduce its contents. During her deposition, Pinede testified that the email was brief and focused on her purported mistreatment by Negatu, without any mention of her national origin. (See Pinede Dep. at 95:21-96:5, 132:24-134:4.) As such, there is no evidence in the record demonstrating that the contents of that email would notify a reasonable person that Pinede was complaining of discrimination based on her membership in a protected class.

[25] Pinede claims she did not know that it was necessary to mark the box related to national origin. That is irrelevant. The question is whether her complaint put her supervisors on notice that she was engaging in protected activity. Since the complaint was entirely silent as to any protected categories, it did not.

## B.     Pretext

Even if Pinede could show a prima facie case of retaliation, she cannot establish that defendants' legitimate, non-retaliatory reason for the demotion—her own misconduct—was mere pretext. In order to avoid summary judgment at this stage, Pinede must provide evidence sufficient to create a genuine issue of material fact such that a reasonable fact-finder could conclude that but-for her complaints, she would not have been placed on probation and terminated. See Nassar, 570 U.S. at ---, 133 S. Ct. at 2533 (2013). Pinede's guilty plea largely settles the matter because it necessarily admits that she did, in fact, falsify data and was absent without leave. Given that misconduct, no reasonable fact finder could conclude that her demotion stemmed primarily from impermissible retaliation.

## VI.     Equal Protection Claim

Finally, defendants' argue that Pinede's § 1983 claim must fail because she fails to allege that the purported discrimination resulted from a municipal policy or custom as required by Monell v. Department of Social Services, 436 U.S. 658 (1978). Since Pinede fails to respond to that argument, her § 1983 claim against the City is deemed abandoned and dismissed. See Apple, 2014 WL 5450030, at *6. Moreover, defendants persuasively argue that the record is devoid of any indication that a municipal policy or custom prompted Pinede's demotion and therefore summary judgment would be appropriate in any event. See Staten v. City of New York, No 12-CV-3544 (ER), 2014 WL 3907926, at *5-6 (S.D.N.Y. Aug. 7, 2014) (granting summary judgment on Monell claim where the plaintiff failed to provide more than conjecture that actions resulted from municipal policy or custom).

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted. The

Clerk of Court is directed to enter Judgment in favor of defendants and close the case.

SO ORDERED.

Dated: July     *10*  , 2015
     Brooklyn, New York

                               s/Carol Bagley Amon

                               Carol Bagley Amon
                               Chief United States District Judge